ERIC ZAJAC, ESQ.
ZAJAC & ARIAS LAW FIRM, L.L.C.
1835 Market Street, 26th Floor
Philadelphia, PA 19103
Telephone: (215) 575-7615
Facsimile: (215) 575-7640
Attorneys for Plaintiff, Lawrence Delloye

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| LAWRENCE DELLOYE,<br><br>Plaintiff<br><br>vs.<br><br>REVOLUTIONARY ARMED FORCES OF COLUMBIA a/k/a FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA a/k/a FARC; JORGE ENRIQUE RODRIGUEZ MENDIETA a/k/a "Ivan Vargas; JUVENAL OVIDIO RICARDO PALMERA PINEDA a/k/a "Simon Trinidad"; GERARDO AGUILAR RAMIREZ, a/k/a "Cesar,"; NAYIBE ROJAS VALDERAMA a/k/a "Sonia"; JOSE ANTONIO CELIS a/k/a "Calvo"; JUAN DIEGO GIRALDO a/k/a "Flaco; ERMINSO CUEVAS CABRERA a/k/a "Mincho; JUAN JOSE MARTINEZ VEGA a/k/a "Chiguiro"; YARLEI BANOL-RAMOS a/k/a "Diana"; JOSE FERNANDO ROMERO MEJIA a/k/a "El Morocho"; JOSUE CUESTA LEON a/k/a "El Viejo"; LUCIANO MARÍN a/k/a "Iván Márquez"; RODRIGO LONDOÑO ECHEVERRY a/k/a "Timochenko" a/k/a "Timoleón Jiménez"; JORGE TORRES VICTORIA, a/k/a "Pablo Catatumbo"; FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape"; MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez"; JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian | Civil Action No.:<br><br><br><br><br><br><u>COMPLAINT</u> |

Ramirez"; NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles"; HENRY CASTELLANOS GARZON, a/k/a "Romana"; RODRIGO GRANDA a/k/a "Ricardo Gonzalez"; ALEXANDER FARFAN SUAREZ a/k/a "Enrique Gafas"; MARTIN CUERO; HELI MEJIA MENDOZA a/k/a "Martin Sombra"; and WALTER TAPIERO a/k/a COMMANDER ROMEL,

　　　　　　　　　　Defendant(s).

1. This is a civil action for damages arising from acts of international terrorism committed by the REVOLUTIONARY ARMED FORCES OF COLOMBIA also known as FUERZAS ARMADAS REVOLUCIONARIAS DE COLOMBIA (the "FARC"), and its members.

2. The FARC and its members kidnapped Plaintiff's mother, Ingrid Betancourt, on February 23, 2002 while she was campaigning for the Colombian presidency as a member of the Oxygen Green Party.

3. Plaintiff suffered damages while his mother was held hostage for 2,321 days until she was rescued and released on July 2, 2008.

4. This action is brought pursuant to the civil remedies provisions of the Anti-Terrorism Act, 18 U.S.C. § 2333 which provides:

> "(a) **Action and jurisdiction.**--Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees."

5. Plaintiff seeks damages against the FARC, which between at least 2002 and 2008 was a designated foreign terrorist organization ("FTO"), the FARC, and its members in leadership who committed acts of international terrorism, conspired to commit acts of international terrorism or provided material support to the FARC.

6. Pursuant to 18 U.S.C. § 2338, the district courts of the United States have exclusive jurisdiction over this action.

7. Pursuant to 18 U.S.C. § 2334(a), "Any civil action under section 2333 of this title against any person may be instituted in the district court of the United States for any district where any plaintiff resides or where any defendant resides or is served, or has an agent."

8. Venue is proper in the Middle District of Pennsylvania because one of the defendants, namely JORGE ENRIQUE RODRIGUEZ MENDIETA resides in a Federal Correctional Institution ("FCI") located in Allenwood, Pennsylvania.

## THE PLAINTIFF

9. Plaintiff LAWRENCE DELLOYE is a United States national who was born in San Bernardino, California in 1988. Plaintiff attended college in the United States and currently resides in France. Plaintiff was damaged by repeated acts of international terrorism which occurred between February 23, 2002 and the date of his mother's rescue on July 2, 2008. The FARC and its members caused Plaintiff to suffer damages associated with being separated from his mother, and enduring emotional distress over not knowing whether his mother was dead or alive, or whether he would ever be reunited with her. Even after his mother's release, the disclosure of information to Plaintiff about the facts surrounding his mother's time as a hostage caused and continues to cause Plaintiff to suffer damages.

## THE DEFENDANTS

10. The FARC was designated as a FTO pursuant to Title 8, United States Code, Section 1189 on October 8, 1997 as re-designated on October 11, 2005.

11. Defendant, JORGE ENRIQUE RODRIGUEZ MENDIETA a/k/a "Ivan Vargas" was a commander in FARC. He was arrested in or around 2004 and extradited to the United States for narcotics trafficking. He currently resides in the FCI in Allenwood, Pennsylvania and is subject to the jurisdiction of this Court.

12. Defendant, JUVENAL OVIDIO RICARDO PALMERA PINEDA a/k/a "Simon Trinidad" was responsible for making the decision to kidnap Plaintiff's mother, Ingrid Betancourt. He is incarcerated in federal prison in Colorado after being convicted in federal court in the District of Columbia of conspiracy to commit hostage taking and is subject to the jurisdiction of this Court.

13. Defendant, GERARDO AGUILAR RAMIREZ, a/k/a "Cesar," a former front commander in FARC, was sentenced to 27 years in prison for conspiring to import ton-quantities of cocaine into the United States. He was in charge of FARC's hostages, including Plaintiff's mother. He is subject to the jurisdiction of this Court.

14. Defendant NAYIBE ROJAS VALDERAMA a/k/a "Sonia" was a commander of the Southern Block. Under Joaquín Gomez's command, the Southern Block was responsible for executing the order of kidnapping Plaintiff's mother. Sonia is currently incarcerated in the United States after being convicted of narcotics trafficking in federal court in the District of Columbia and is subject to the jurisdiction of this Court.

15. Defendant JOSE ANTONIO CELIS a/k/a "Calvo" was a FARC drug trafficker and is currently incarcerated in the United States after being convicted of narcotics trafficking in federal court in the District of Columbia and is subject to the jurisdiction of this Court.

16. Defendant JUAN DIEGO GIRALDO a/k/a "Flaco" worked with Sonia and Calvo to purchase and transport cocaine, bought equipment for the FARC's cocaine production operation, and assisted Sonia and the FARC in all aspects of cocaine production and sale, and is currently incarcerated in the United States after being convicted of narcotics trafficking in federal court in the District of Columbia and is subject to the jurisdiction of this Court.

17. Defendant ERMINSO CUEVAS CABRERA a/k/a "Mincho" was a high ranking member of the FARC who is incarcerated in FCI McKean in the Western District of Pennsylvania, and is subject to the jurisdiction of this Court.

18. Defendant JUAN JOSE MARTINEZ VEGA a/k/a "Chiguiro" was a high ranking member of the FARC who is incarcerated in FCI Butner Low in the Eastern District of North Carolina and is subject to the jurisdiction of this Court.

19. Defendant YARLEI BANOL-RAMOS a/k/a "Diana" was a high ranking member of the FARC who is incarcerated in FCI Aliceville in the Northern District of Alabama, and is subject to the jurisdiction of this Court.

20. Defendant JOSE FERNANDO ROMERO MEJIA a/k/a "El Morocho" was a high ranking member of the FARC who is incarcerated in FCI Coleman Low in the Middle District of Florida, and is subject to the jurisdiction of this Court.

21. Defendant JOSUE CUESTA LEON a/k/a "El Viejo" was a high ranking member of the FARC who is incarcerated in FCI Texarkana in the Eastern District of Texas, and is subject to the jurisdiction of this Court.

22. Between at least 2002 and 2008, the following Defendants were high ranking members of the FARC who participated in the decision to kidnap Plaintiff's mother and keep her as a hostage as part of the FARC's war strategy, and whose last known whereabouts were in Colombia:

   i. LUCIANO MARÍN a/k/a "Iván Márquez";
   ii. RODRIGO LONDOÑO ECHEVERRY a/k/a "Timochenko" a/k/a "Timoleón Jiménez";
   iii. JORGE TORRES VICTORIA, a/k/a "Pablo Catatumbo";
   iv. FELIX ANTONIO MUNOZ LASCARRO, a/k/a "Jose Lisandro Lascarro," a/k/a "Pastor Alape";
   v. MILTON DE JESUS TONCEL REDONDO, a/k/a "Joaquin Gomez";
   vi. JOSE BENITO CABRERA CUEVAS, a/k/a "Fabian Ramirez";
   vii. NOE SUAREZ ROJAS, a/k/a "German Briceno Suarez," a/k/a "Grannobles";
   viii. HENRY CASTELLANOS GARZON, a/k/a "Romana";
   ix. RODRIGO GRANDA a/k/a "Ricardo Gonzalez";
   x. ALEXANDER FARFAN SUAREZ a/k/a "Enrique Gafas";
   xi. MARTIN CUERO;
   xii. HELI MEJIA MENDOZA a/k/a "Martin Sombra";
   xiii. WALTER TAPIERO a/k/a COMMANDER ROMEL;

23. Between at least 2002 and 2008, Defendants were all terrorists and members of the FARC.

24. Between at least 2002 and 2008, Defendants intentionally engaged in terrorist activities or provided support for terrorist activities, including but not limited to hostage taking, kidnapping and imprisoning of Plaintiff's mother and caused Plaintiff to sustain damages.

25. Defendants knew or should have known that their actions would cause Plaintiff to suffer damages since terrorist activity by its very nature is directed not only at the victims but also at the victims' families.

## DEFENDANTS TERRORIST ACTIVITIES

26. Between at least February 23, 2002 and July 2, 2008, defendants engaged in international terrorism, including premeditated, politically motivated violence, threats of violence, hostage takings, and other terrorist related activities perpetrated against noncombatant targets including Plaintiff's mother and United States nationals in order to influence United States and Colombian policy.

27. Between at least February 23, 2002 and July 2, 2008 defendants controlled illegal narcotics production in Colombia and engaged in international narcotics distribution and sale directed at the United States and its citizens, outside of the borders of Colombia and defendants used kidnapping and hostage taking as part of their illegal narcotics trafficking as terrorist activities. Defendants used Plaintiff's mother as a shield to prevent military action and to further their drug trafficking activities.

28. Defendants conspired to kidnap Plaintiff's mother, Ingrid Betancourt, and to hold her captive and broadcast her photographs worldwide for the express purpose of inflicting terror on United States citizens and to influence United States and Colombian government policy.

29. Defendants are strongly anti-American, and have engaged in violent acts against Americans.

30. Between February 23, 2002 and July 2, 2008, the FARC engaged in terrorists acts that were directed toward Plaintiff's mother, including but not limited to the following:

   a. repeatedly transported Plaintiff's mother to remote areas with her neck chained;

   b. detained Plaintiff's mother under armed guard and threat of death at various locations in the jungle;

   c. starved Plaintiff's mother for long periods of time;

   d. prepared and published forced proof of life videos which were aired in the United States and outside of the United States which were viewed by Plaintiff and other members of Plaintiff's family;

   e. named senior commanders with expertise in negotiations to represent the FARC in negotiations with the Colombian government for the release of Plaintiff's mother and others;

   f. concealed the location of Plaintiff's mother;

   g. subjected Plaintiff's mother to cruel and inhumane conditions resulting in illness, mental and physical injury and trauma;

   h. denied Plaintiff's mother adequate food and denied medical care.

31. Between at least February 23, 2002 and July 2, 2008, defendants issued public statements in English and Spanish conveying anti-American views, and condemning the policies of the United States.

32. In July 2002 and August 2003, the defendants forced Plaintiff's mother to participate in videotaped interviews to prove that she was alive and being held by the defendants.

33. Defendants knew or should have known that Plaintiff would view the proof of life videos.

34. The proof of life videos were delivered to United States media outlets and aired throughout the United States and abroad and were viewed by Plaintiff and other members of his family.

35. During Ingrid Betancourt's period of captivity, defendants demanded, in a form of communications published in the United States and outside of the United States, the release of two convicted FARC terrorists or the defendants would injure and continue to forcibly detain hostages, including Plaintiff's mother.

36. Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the United States Government by intimidation or coercion, and to impact the conduct of a government by kidnapping, hostage taking and assassination.

37. Defendants individually and collectively knew or should have known that their activities would subject them to the jurisdiction of the United States for criminal and civil liability.

38. Defendants' actions have established minimum contacts with the United States.

39. This Court may exercise personal jurisdiction over the defendants.

### IMPACT OF DEFENDANTS' TERRORISTIC ACTS ON PLAINTIFF

40. In 2002, it was well known that Plaintiff's mother was a Colombian politician who was running for President.

41. When Plaintiff's mother was kidnapped by the FARC on February 23, 2002, Plaintiff was only 13 years old.

42. Plaintiff learned that his mother was kidnapped by the FARC when she sent a fax to Plaintiff's grandfather in Bogota stating that she had been kidnapped by the FARC at a road block.

43. Plaintiff believed that when his mother wrote the fax message, she did not know whether she would ever see Plaintiff or her family again. At 13 years old, Plaintiff feared this fax message would be the last communication that he would ever receive from his mother.

44. On February 25, 2002, people who were travelling in the same car with Plaintiff's mother when she was kidnapped were released. Those individuals gave the media and Plaintiff and his family the story of the kidnapping. Plaintiff learned from the kidnapping survivors that his mother feared execution.

45. On February 27, 2002, a video of a FARC commander was released to the press wherein the FARC claimed responsibility for the kidnapping of Plaintiff's mother. The video stated that Plaintiff's mother was going to be exchanged for FARC rebels. The message was that the Colombian Government had one year to negotiate the releases, and after such time the FARC would not be held accountable for Plaintiff's mother's life.

46. On March 23, 2002, Plaintiff's grandfather died and Plaintiff was emotionally impacted by the fact that his grandfather died knowing that Plaintiff's mother's life was in danger.

47. On or about July 24, 2002, FARC released a video of Plaintiff's mother and others that was filmed on May 15, 2002. Plaintiff observed from the video that his mother had lost weight and was speaking in a broken voice. Plaintiff observed that his mother was holding back her tears as she explained how she found out the news of her father's (Plaintiff's grandfather's) death. In the video, Plaintiff observed his mother reading an old newspaper which contained a picture of Plaintiff's grandfather's funeral and his coffin.

48. Plaintiff was significantly impacted emotionally when he saw his mother's pain on the television screen.

49. On or about September 29, 2002, Plaintiff learned about a media release which indicated that his mother was ill. An article in the weekly newspaper, Semana, stated that Plaintiff's mother was hospitalized in the town of Planadas in a zone controlled by the FARC. Plaintiff and his family were terrified for his mother's well-being.

50. On or about May 5, 2003, two political hostages held by the FARC, Guillermo Gaviria and Gilberto Echeverri, were assassinated by the FARC along with eight military hostages.

51. Plaintiff was horrified by the assassination news and Plaintiff believed that his mother would be assassinated.

52. On August 31, 2003, Plaintiff's mother's second proof of life video was released by the FARC. This video represented the first proof of his mother being alive since July 2002.

53. In the second proof of life video, Plaintiff's mother stated that she was in good health and was strong; but the video was difficult for Plaintiff to watch. In this video, Plaintiff's mother requested a military operation. Plaintiff and his family feared that a failed military operation would put his mother's and other lives at risk.

54. In the August 31, 2003 video, Plaintiff observed desperation by his mother, which resulted in sleepless nights for Plaintiff and constant fear of losing his mother.

55. In 2004, Plaintiff fell back a year in school because he could not concentrate in school knowing that his mother was the FARC's hostage.

56. On or about October 23, 2004, Plaintiff learned that his grandmother received a call from a person with ties to the FARC. Plaintiff learned that his mother nearly died during a hunger strike in captivity.

57. On or about February 2, 2005, Raul Reyes, a FARC leader, published a statement saying that Plaintiff's mother was "safe and sound" but Plaintiff and his family had not received

a real proof of life in over a year and a half. Plaintiff feared that this representation was not true and that the FARC were lying to the public. Plaintiff feared that his mother was dead.

58. In 2005, Plaintiff and his family began asking the media for assistance in securing proof from the FARC that his mother was still alive. Plaintiff took time off from school to participate in numerous interviews, and he traveled around the world asking for support from politicians.

59. On or about March 11, 2005, in a discussion with a journalist, Raul Reyes reiterated that Plaintiff's mother was alive, but Plaintiff still had not received another proof of life.

60. On or about July 4, 2005, Raul Reyes stated to the media that if Colombian President Uribe was reelected, Plaintiff's mother would most likely spend four more years in captivity.

61. Plaintiff learned that on or about January 20, 2006, another military hostage held by the FARC, namely Captain Julian Ernesto Guevarra died in captivity after seven years. The media said his health deteriorated, he grew very ill and the FARC left him to die. Plaintiff feared that this would happen to his mother if she was not already dead.

62. On or about February 17, 2006, approximately four years after her kidnapping, Plaintiff heard rumors that the FARC were about to release a new proof life for Plaintiff's mother. No proof of life video was published at that time.

63. In 2006, Plaintiff heard other rumors, including but not limited to rumors involving Plaintiff's mother's death and her burial in a mass grave.

64. On or about September 25, 2006, a FARC leader stated that Plaintiff's mother was alive and in good health. FARC showed a hostage video involving other political hostages, but the video did not include Plaintiff's mother.

65. On or about May 15, 2007, Jhon Franck Pinchao, a policeman who had been kidnapped for over eight years by the FARC, managed to escape. Plaintiff learned that Pinchao was lost

in the jungle for over 17 days before he was able to reach a police patrol. Pinchao advised Plaintiff that he was held in the same camp as Plaintiff's mother and that she was still alive when he escaped on April 27, 2007.

66. Pinchao advised Plaintiff that his mother attempted to escape five times and that each time she had been recaptured and severely punished. It was difficult for Plaintiff to hear Pinchao describe the harshness of life in captivity. In particular, it was difficult for Plaintiff to learn from Pinchao that his mother was chained around the neck and tied to a tree.

67. Plaintiff learned that on or about June 28, 2007, the FARC executed eleven political hostages in the "diputados del Valle." The FARC claimed that these hostages were killed during a military attempt to rescue the hostages.

68. On December 1, 2007, a letter written by Plaintiff's mother and a video were finally released. The video was dated in October 2007. This video was the first proof of life that Plaintiff received since August 31, 2003. In the video, Plaintiff's mother described the harshness of her daily reality and that she believed death would be better than living in hostage conditions. Plaintiff believed his mother wrote the letter as a way to say goodbye to Plaintiff and his family.

69. Plaintiff was emotionally disturbed by the video which showed his mother sitting on a bench in the dark jungle. After viewing the video, Plaintiff believed that his mother was weak and in pain.

70. After seeing the video on December 1, 2007, Plaintiff woke up with a knot in his stomach every morning, fearing that his mother was going to die. Plaintiff could not escape the image of his mother sitting on a bench in the jungle.

71. By 2007, Plaintiff was in a university in Paris, but was regularly missing classes because the thought of his mother being held as a hostage was difficult to overcome.

72. On or about January 1, 2008, two hostages were freed by the FARC and same was facilitated by Venezuelan President Chavez.

73. On February 27, 2008, six years after his mother was taken hostage, Plaintiff learned that four other political hostages were released with the assistance of President Chavez.

74. On or about March 1, 2008, Raul Reyez, the man Plaintiff understood to be the second in command in the FARC, was killed during a Colombian airstrike. Plaintiff believed that his death interrupted any possible negotiations to release his mother.

75. Finally, after 2,321 days, Plaintiff's mother was freed along with 14 other hostages by a rescue operation that was put into place by the Colombian military.

76. After Plaintiff's mother's return, there was a euphoric period that lasted a few months, but it was not easy for Plaintiff to reconnect with his mother.

77. When Plaintiff's mother was kidnapped, Plaintiff was still a child. When Plaintiff and his mother were reunited, Plaintiff was almost 20 years old.

78. It took several years for Plaintiff and his mother to reestablish a relationship.

79. Defendants actions took Plaintiff's mother away from him during his formidable years, and it caused Plaintiff to suffer emotional distress which he continues to endure.

## COUNT ONE
### 18 U.S.C. § 2333
### (Intentional Infliction of Emotional Distress)

80. Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 79 of the Complaint inclusive with the same force and effect as if fully set forth herein.

81. Plaintiff is a United States national injured by reason of an act of international terrorism and seeks damages under 18 U.S.C. § 2333.

82. Plaintiff was victimized by acts of "international terrorism" as defined by 18 U.S.C. § 2331(1) which states:

> "(1) the term "international terrorism" means activities that--
>
> **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;
>
> **(B)** appear to be intended--
> (i) to intimidate or coerce a civilian population;
> to influence the policy of a government by intimidation or coercion; or
> (ii) to affect the conduct of a government by mass destruction, assassination, or kidnapping; and
>
> **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum."

83. Defendants' activities involved violent and dangerous acts to human life that were, and are, a violation of the criminal laws of the United States or of any State.

84. Defendants' acts were intended to intimidate or coerce the Colombian and United States civilian population, to influence policy of the United States Government by intimidation or coercion, and to impact the conduct of a government by kidnapping, hostage taking and assassination.

85. Defendants' activities occurred outside the territorial jurisdiction of the United States and transcended international boundaries.

86. Defendants' actions were acts of international terrorism as defined under 18 U.S.C. §2331 and §2333.

87. Defendants' participation in the terrorist conspiracy are "terrorism" and "terrorist activity" under 18 U.S.C. §2339.

88. Defendants intentionally and purposefully engaged in terrorist activities, including hostage taking, kidnapping, and imprisoning of Plaintiff's mother.

89. As a terrorist organization, or as members of a terrorist organization and criminal conspiracy, defendants are all terrorist parties who proximately caused the death and injuries described herein and are all jointly and severally liable for the terrorist acts, including acts of international terrorism, the aiding and abetting of international terrorism, conspiring to commit further acts of international terror, engaging in a joint single enterprise to conduct international terrorism through illegal schemes, and/or the material support and sponsorship of international terrorism.

90. Defendants knew or should have known that their terrorist acts and/or their support for the terrorist acts would result in the intentional infliction of emotional distress to Plaintiff because: the Defendants' acts were intentional or reckless; the Defendants' terrorist conduct was extreme and outrageous; and the conduct was the cause of severe emotional distress to the Plaintiff.

91. Defendants knew or should have known that by engaging in terrorist activity, their actions were, by their very nature, directed not only at Plaintiff's mother, but also at Plaintiff.

**WHEREFORE**, Plaintiff, Lawrence Delloye, demands judgment in his favor against all defendants, jointly and severally, for his past and future physical and mental pain and suffering, solatium, mental anguish, loss of capacity for the enjoyment of life, emotional

distress, loss of 2,321 days without his mother, including treble damages under 18 U.S.C. 2333, plus interest, costs, attorney's fees, and such other monetary and equitable relief as this Honorable Court deems appropriate to compensate Plaintiff.

ZAJAC & ARIAS LAW FIRM, L.L.C.<br>
Attorneys for Plaintiff, Lawrence Delloye

Dated: June 28, 2018

BY: *Eric Zajac*
ERIC ZAJAC, ESQ.